IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAMONA BROOMER, | : | CIVIL ACTION NO. **4:CV-09-0027** |
| | : | |
| Plaintiff | : | |
| | : | (Judge Jones) |
| v. | : | |
| | : | (Magistrate Judge Blewitt) |
| LOCH HAVEN UNIVERSITY, et al., | : | |
| | : | |
| Defendants | : | |

## REPORT AND RECOMMENDATION

### I. Background.

On April 9, 2008, Plaintiff, Ramona Broomer, an employee of Defendant Loch Haven University ("the University"), filed a Complaint in the Eastern District of Pennsylvania alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq*. (Doc. 1).  Plaintiff filed an Amended Complaint on November 13, 2008. (Doc. 3).  On December 30, 2008, this case was transferred to the Middle District of Pennsylvania.  (Doc. 11).  Subsequently, Plaintiff filed a Second Amended Complaint ("SAC") on February 10, 2009.  (Doc. 18).  Defendants filed a Motion to Dismiss Plaintiff's SAC.  (Doc. 19).

On November 9, 2009, the Court issued a Memorandum and Order regarding Defendants' Motion to Dismiss Plaintiff's SAC.  (Doc. 37). The Court stated the following background of this case:

> Plaintiff Ramona Broomer ("Plaintiff") is an African American woman employed as an Assistant Professor at Lock Haven University of Pennsylvania. (SAC 1-2). Named as Defendants in this action are Lock Haven University of Pennsylvania (hereinafter "Lock Haven University"); the University Players, a "student run theater organization" at Lock Haven University; Christine Woodworth, a faculty member at Lock Haven University; Roger Johnson,

Provost and former Dean of the College of Arts and Sciences at Lock Haven University; David White, the Dean of Students at Lock Haven University; the Pennsylvania State System of Higher Education; John C. Cavanaugh, Chancellor of the Pennsylvania State System of Higher Education; the Pennsylvania Department of Education; and Gerald Zahorchak, Secretary of the Pennsylvania Department of Education. [FN1] (SAC 3-8).

The Second Amended Complaint contains four counts and seeks relief under Title VII of the Civil Rights Act of 1964 (Count I), a pendant state law theory of defamation (Count II), 42 U.S.C. § 1981 (Count III), and 42 U.S.C. § 1983. Count I is brought against Lock Haven University and the Pennsylvania State System of Higher Education. Count II is brought against David White and Christine Woodworth. Counts III and IV are brought against Lock Haven University.

Plaintiff alleges that she was discriminated against on the basis of her race by (1) hiring her on a temporary basis instead of on a tenured track (SAC 17-21, 82-85, 129-131); (2) failing to promote her to an associate professor (SAC 22-23, 51-57, 63-66, 72, 80-81, 87-91, 97-102, 128, 132-139, 144, 153); (3) denying her an opportunity to travel abroad as a new hire (SAC 24-28); (3) accusing her of mismanagement of funds and removing her from her duties as University costume designer (SAC 31-4-, 58-61, 71-72, 92, 94-95, 105, 154-55); and (5) denying her educational leave (SAC 46-49, 140-142). Plaintiff also asserts a defamation claim. (SAC 41-45, 109-120).

FN1 Within her opposition brief to the Motion, Plaintiff concedes to the removal of Defendants John Cavanaugh, Gerald Zahorchak and the Pennsylvania Department of Education from this action. (Opp. Br., p. 15). Accordingly, these Defendants shall be dismissed as parties to this action.

(Doc. 37, pp. 3-5).

The Court noted that Defendants did not "move to dismiss Plaintiff's Title VII claim against Lock Haven University and [PSSHE] that she was accused of mismanagement of funds and had her duties as University costume designer taken away." (Doc. 37, p. 5, n. 2).

In its November 9, 2009, the Court also stated the following Title VII claims Plaintiff asserted in her SAC were dismissed from this case:

2

Further, we find that the alleged failure to hire Plaintiff as a tenure track professor, failure to promote Plaintiff to an associate professor and denial of travel abroad are not within the scope of the March 7, 2007 EEOC charge, and thus were not exhausted. The March 7, 2007 EEOC charge specifically identifies false allegations against Plaintiff and removal from her position as costume designer as the particular discriminatory conduct to which she was subjected. Notably, the alleged discriminatory hiring, failure to promote and denial of travel abroad all occurred *prior* to the filing of the EEOC charge, not during the pendency thereof, and yet they were not included within Plaintiff's description of particular conduct within the charge. Additionally, the alleged discriminatory hiring, failure to promote and denial of travel abroad are each isolated instances of conduct, and not so intertwined or related to the accusation mismanagement of funds or loss of costume designer position that they are "within the scope" of the EEOC charge.

Thus, we conclude that Plaintiff failed to exhaust her administrative remedies with respect to her claims for discriminatory hiring (by failing to hire her to a tenure track position), failure to promote Plaintiff to an associate professor and denial of travel abroad privileges. These claims shall be dismissed from Plaintiff's Title VII count [of her SAC].

(Doc. 37, p. 8 and p. 16).

Thus, the Court dismissed Plaintiff 's Title VII claims regarding discriminatory hiring, failure to promote and denial of travel abroad since they were outside the scope of Plaintiff's EEOC charge. (*Id*., p. 16).

The Court granted Defendants' Motion to Dismiss Plaintiff's SAC with respect to Defendants Cavanaugh, Zahorchak, the PA Department of Education, White, Johnson, and the University Players. (Doc. 37). As stated, the Court dismissed from Count I of her SAC Plaintiff's Title VII claims pertaining to discriminatory hiring, failure to promote and denial of travel abroad. Further, the Court dismissed Counts III and IV of Plaintiff's Second Amended Complaint. (*Id*., p. 16).

Thus, Plaintiff's remaining claims are her Title VII race discrimination claim against Defendants the University and the PA State System of Higher Education ("PASSHE") for the

temporary loss of her costume design duties, and her state law defamation claim against Defendant Woodworth.  Plaintiff's allegations regarding her Title VII claim are found in her SAC at ¶'s 31-40, 58-61, 71-72, 94-95, 105, and 154-155.  Plaintiff's allegations regarding her defamation claim are found in her SAC at ¶'s 41-45, 109-115 and 119-123.

On May 9, 2011, the three remaining Defendants jointly filed a Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56.  **(Doc. 67).**  Defendants simultaneously filed their Statement of Material Facts ("SMF") and their Exhibits.  (Docs. 68 and 69).  After being granted extensions of time, Defendants filed their support brief on June 8, 2011.  (Doc. 79).  Also, after being granted extensions of time, Plaintiff filed her opposition brief on July 22, 2011, and her Affidavit with exhibits and the Affidavit of her attorney with exhibits.  (Docs. 89, 90 and 91).[1]  After being granted an extension of time, Defendants filed their reply brief on August 17, 2011.   (Doc. 96).  Defendants' Summary Judgment Motion is ripe for disposition.[2]

This Court has jurisdiction over this action with respect to Plaintiff's federal claim, *i.e.* her Title VII race discrimination claim,  pursuant to 28 U.S.C. § 1331.  *See Page v. Trustees of Univ. of Pennsylvania*, 222 Fed. Appx. 144, 145, n. 1 (3d Cir. 2007); *Burlington v. News Corp.*, 759 F.Supp. 2d 580 (E.D. Pa. 2010).  This Court may exercise pendent jurisdiction over Plaintiff's state law defamation claim pursuant to 28 U.S.C. § 1367.  *See Slater v. Susquehanna Co.*, 613 F. Supp. 2d

---

[1]Plaintiff's opposition brief was docketed twice, Docs. 89 and 93.

[2]The undersigned has been referred Defendants' Summary Judgment Motion by the Court for issuance of a Report and Recommendation.  (Doc. 72).

4

653, 657 (M.D. Pa. 2009).[3]

## II. Summary Judgment Standard.

A motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56.  The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c).  An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph*, 842 F.2d 689, 693-694 (3d Cir. 1988) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A fact is "material" if proof of its existence or non-existence could affect the outcome of the action pursuant to the governing law. *Anderson*, 477 U.S. at 248.  "Facts that could alter the outcome are material facts." *Charlton v. Aramus Bd. of Educ.*, 25 F. 3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022 (1994).

The burden of proving that there is no genuine issue of material fact is initially upon the movant. *Forms, Inc. v. American Standard, Inc.*, 546 F. Supp. 314, 320 (E.D. Pa. 1982), *aff'd mem.* 725 F.2d 667 (3d Cir. 1983).  Upon such a showing, the burden shifts to the nonmoving party. *Id*. The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a

---

[3]The Court can exercise supplemental jurisdiction over Plaintiff's pendent state law defamation claim if her federal claim (Title VII) is permitted to proceed.  If Plaintiff's federal claim is found subject to summary judgment, this Court should not exercise jurisdiction over Plaintiff's pendent state claim contained in her SAC. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S. Ct. 1130 (1966).

genuine issue for trial." Fed.R.Civ.P. 56(e).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir. 1988). In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id.*, quoting *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied,* 474 U.S. 1010 (1985); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976) *cert. denied*, 429 U.S. 1038 (1977).

Under Rule 56 summary judgment must be entered where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Moreover, the Third Circuit has indicated that "although the party opposing summary judgment is entitled to 'the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact,' and 'cannot rest solely on assertions made in the pleadings, legal memorandum or oral argument.'" *Goode v. Nash*, 2007 WL 2068365 (3d Cir. 2007)(Non-Precedential)(citation omitted).

Thus, "summary judgment is proper, when, viewing the evidence in the light most favorable to the non-movant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. General Motors*, 2009 WL 237247, *2 (3d Cir.)(citation omitted); *Page v. Trustees of Univ. of Pennsylvania*, 222 Fed. Appx. 144 at 145 (3d Cir. 2007) (the court must "view the facts in the light most favorable to the party opposing the [summary judgment]

motion when making [its] determination."); *Burlington v. News Corp.*, 759 F.Supp. 2d at 589-90.

**III. Material Facts**.

As mentioned, Defendants properly submitted their SMF (Doc. 68) with their Summary Judgment Motion, and Plaintiff has failed to respond to it as required. Therefore, Defendants are correct that all material facts stated in their SMF should be deemed admitted since they are supported by citation to the record. (Doc. 96, pp. 2-3).

As Defendants state, they filed their SMF, ¶'s 1-27, with respect to their Motion for Summary Judgment as required by Local Rule 56.1 M.D. Pa. (Doc. 68).[4] All of Defendants' SMF are properly supported by citation to the record, namely, Doc. 69. As Defendants point out (Doc. 96), Plaintiff failed to properly respond, paragraph by paragraph, to each one of their SMF, and she failed to cite to any evidence in the record to dispute, paragraph by paragraph, Defendants' SMF. Rather, Plaintiff filed her own Certification and 161-paragraph Statement of Facts, some of which are supported by citation to the record and some of which are not. (Doc. 90). Plaintiff's attorney also filed her own Certification to which she attaches deposition excerpts that are referenced in Plaintiff's Statement of Facts. (Doc. 91). Plaintiff's attorney also adds six new SMF in her Certification.[5]

---

[4] "Material facts" are those which might affect the outcome of the suit. *Justofin v. Metropolitan Life Ins. Co.*, 372 F.3d 517, 521 (3d Cir. 2004).

[5] Plaintiff is represented by counsel and she is required to abide by the relevant Local Rules of this Court. Rule 56.1 does not allow a party opposing a summary judgment to simply file their own SMF without responding, paragraph by paragraph, to the SMF filed by the moving party.

Thus, Plaintiff failed to file a paragraph-by-paragraph response to each paragraph (1-27) of Defendants' SMF as she was required to do.  Plaintiff appears to have misconstrued her obligation under Local Rule 56.1 and filed her own SMF as opposed to responding to each paragraph of Defendants' SMF.  Regardless, all 27 paragraphs of Defendants' SMF (Doc. 68) are supported by the record found at Doc. 69.  Thus, as Defendants state (Doc. 96, pp. 2-3), all of Defendants' SMF are undisputed and should be deemed admitted.[6]  *See Cyrus v. Laino*, Civil No. 08-1085, M.D. Pa.; *Cyrus v. Freynik*, Civil No. 08-2278, M.D. Pa.; *Michtavi v. Martinez*, 2009 WL 5172962 (M.D. Pa.); *Hemingway v. Ellers, 2008 WL 3540526 (M.D. Pa.); Accolla v. U.S.*, 2009 WL 3625383 (M.D. Pa.), affirmed 2010 WL 763550 (3d Cir.)(court found that since Plaintiff inmate in civil rights action did not properly respond to prison staff Defendants' statement of facts as required by L.R. 56.1, M.D.

---

[6]Insofar as Plaintiff has failed to respond to each paragraph in Defendants' SMF and has failed to point to evidence in the record to support any denials of Defendants' SMF, Defendants' paragraphs are all supported by their evidence and accepted as undisputed.

In the case of *Barthalow v. David H. Martin Excavating, Inc.*, 2007 WL 2207897, * 1, n. 5, (M.D. Pa. 2007), this Court noted:

> The Middle District of Pennsylvania's Local Rule of Court 56.1 provides that a summary judgment motion must include a separate concise statement of material facts. M.D. Pa. Local R. 56.1. The rule also requires that an opposition to a summary judgment motion must similarly include a statement that "responds to the numbered paragraphs set forth in [the moving party's concise statement of material facts], as to which it is contended that there exists a genuine issue to be tried." *Id.* Moreover, "[a]ll material facts set forth in [the moving party's statement] will be deemed to be admitted unless controverted by the [opposing party's statement]. " *Id.*

*See also Dusenbery v. U.S.*, 2006 WL 218220, * 1 (M.D.Pa. 2006) ("it appearing that defendants' statement of material facts was properly deemed admitted by plaintiff *see* L.R. 56.1 providing that the moving party's statement of material facts will be deemed admitted unless the non-moving party specifically contradicts the statement").

Pa., Defendants' statement of facts were undisputed).  Despite Plaintiff's failure to properly respond

to Defendants' statement of facts, we accept Defendants' statement of facts since they are all

supported by their undisputed evidence.    Moreover, we will consider Plaintiff's SMF and the

evidence she submitted to the extent they are relevant to the remaining claims in this case. (Docs.

90 and 91).[7]

Defendants' undisputed SMF are as follows:

> 1. The University Players is a student club at Lock Haven University
> dedicated to the theatrical arts. Garvey Decl. ¶1. The University Players sponsor
> and fund Lock Haven University's theater productions. Garvey Decl. ¶1; Johnson
> Dep. at 89; Broomer Dep. at 93-94. The university has no money in its budget to
> fund theater productions. Johnson Dep. at 90. The arrangement that all theater
> production funding goes through the University Players existed from 2001 to 2005.
> Johnson Dep. at 90-91; White Dep. at 64-65. Requests for vouchers went to the
> student treasurer for the University Players. Broomer Dep. at 91-92.

> 2. The University Players are sponsored and funded by the Lock Haven
> University Student Cooperative Council. Garvey Decl. ¶1; Johnson Dep. at 103.

> 3. On September 28, 2005, the treasurer of the University Players, then
> Katie Woodring sent to the University Players Executive Board and the theatre
> faculty members a memorandum setting forth purchasing and accounting
> procedures. [FN1] Garvey Declaration ¶3.

> 4. Among other things, the memorandum provided that all cash advance
> vouchers must be cleared by turning in receipts. Garvey Declaration ¶3, Exhibit A.
> If the receipts totaled less than the cash advances given, a check made out to the

---

[7]We shall not, however, recommend that the Court grant Defendants' Summary
Judgment Motion based on the Defendants' undisputed SMF alone, as Defendants suggest.
(Doc. 96, p. 3).  As stated, we shall also consider Plaintiff's SMF and her evidence  to the extent
they are relevant to the remaining claims in this case, notwithstanding her failure to abide by
this Court's Local Rule.  (Docs. 90 and 91).  As discussed below, we find that Plaintiff's SMF and
her evidence with respect to the issue of whether Defendants took an adverse employment
action against her are largely not relevant to her remaining Title VII claim.

University Players or cash should be submitted in the amount of the difference. *Id*. If receipts totaled more than the cash advance voucher, a reimbursement check would be issued. *Id*. The memorandum stated that new cash advances would not be made if old cash advances were not closed out. *Id*.

5. At the end of the fall semester of 2005, Woodring reviewed the receipts turned in by Professor Ramona Broomer against the cash advances she received for the costumes created for the main stage university production that semester, *Trojan Women*. Garvey Declaration ¶4. She discovered that one of Professor Broomer's cash advances was not closed out completely because she had not accounted for $894.80 of money advanced to her. *Id*.

6. After this discrepancy was discovered, Woodring made several efforts to settle the matter with Professor Broomer. Garvey Declaration ¶5. When those efforts were not successful, on January 17, 2006, Woodring sent a memorandum to Professor Broomer explaining to her that the University Players would not advance her any more money until the earlier voucher was closed out. Garvey Declaration ¶5, Exhibit B. Woodring's decision was supported by the executive board of the University Players. Garvey Declaration ¶5. No member of the university faculty or administration had any influence on this decision. *Id*.

7. The executive board of the University Players gave Professor Broomer several options to permit her to complete costumes for the main stage theater production for spring term, 2006, which was *Little Shop of Horrors*. Among the options permitted was for the University Players to advance money to another individual, such as another faculty member or a student assistant to make purchase at her direction. Garvey Declaration ¶6. Professor Broomer chose not to exercise these options, and would not undertake any costume design duties unless she was permitted to have cash advances. *Id*.

8. Early in the spring term, Roger Johnson, then Dean of the College of Arts and Sciences, obtained the receipts turned in by Professor Broomer and gave them to Richard McCarty to determine if there were a discrepancy between the receipts and the money which had been advanced to Professor Broomer. Johnson Dep. at 92. Mr. McCarty worked in the financial office for the university. *Id*.
9. McCarty determined that approximately $900 could not be accounted for. An additional receipt was then discovered, and the unaccounted money was reduced to 4 or 5 hundred dollars. Johnson Dep. at 94-96.

10. Dr. Johnson spoke to the Provost, Kwesi Aggrey, who was able to obtain money from the University Foundation to pay the difference between the receipts and the cash advances. Johnson Dep. at 97.

11. On February 15, 2006, Woodring and the president of the University Players met with Roger Johnson. Dr. Johnson attempted to persuade the University Players to allow Professor Broomer to receive cash advances again so that she would work on the costumes for *Little Shop of Horrors*. Garvey Declaration ¶7; Johnson Dep. at 98-110.

12. The University Players felt that they should not make an exception to their policy. Garvey Declaration ¶7. Dr. Johnson also told the students that, if Professor Broomer continued to refuse to do costume design without the cash advances, they should do what was necessary to make sure that the production occurred as scheduled. Garvey Declaration ¶7; *see* Johnson Dep. at 109-10, 188 (recalling telling faculty member Stephen Haynes that "he would have to find a way to put the show on....")

13. The executive board of the University Players spoke to another professor in the Theatre Department, Professor Stephen Haynes, and he agreed to design the costumes for *Little Shop of Horrors*. Garvey Declaration ¶8.

14. The following academic year, 2006-2007, Professor Broomer again did not design costumes for either *Machinal* or *Tartuffe*, which were the main stage productions that year. Garvey Declaration ¶9. In the summer of 2006, the University Players were still refusing to advance funds to Professor Broomer for costumes. Harvey Dep. at 69-75, Exhibit 1.

15. In the fall of 2006, Dr. Karen Harvey, then interim Dean of the College of Arts and Sciences attempted to resolve the conflict between the University Players and Professor Broomer, and to get Professor Broomer working on costumes again. Harvey Dep. at 106-09, Exhibit 6.

15. There was meeting in which Katie Woodring participated with Dr. Harvey, in February of 2007. Garvey Declaration ¶10. In the meeting, the administration expressed an interest in having the University Players issue Professor Broomer a credit card so that she would resume her duties as costume designer. Garvey Declaration ¶10; Harvey Dep. at 54-56.

16. The executive board of the University Players was opposed to either issuing Professor Broomer a credit card or advancing her credit because she had never accounted for the outstanding balance that she owed the University Players. Garvey Declaration ¶10. The question of Professor Broomer resuming her duties as costume designer was not resolved at that meeting. Garvey Declaration ¶10.

17. In September 2007, the University Players agreed to resume making cash advances to Professor Broomer. White Dep. Exhibit 3. Professor Broomer served as costume designer for a play, *The Laramie Project*. Johnson Dep. at 235.

18. Sometime in mid-October 2007, Dr. Christine Woodworth and Stephen Haynes of the theater department met several times with David White, who was then Dean of the College of Arts and Science. White Dep. at 22-23. They had concerns about Professor Broomer's performance as costume designer. Specifically, they stated that costumes were not being provided according to schedule and that the costumes were not adequate. White Dep. at 24.

19. Several days after these meetings, on October 18, 2007, Dr. White met with Professor Broomer to discuss these issues about costuming. White Dep. at 22-23, 34-41, Exhibit 2. Dr. White and Professor Broomer came to an understanding that she would have 90% of the costumes done by October 31, 2007. White Dep. at 47-48, Exhibit 2.

20. The following day, Dr. White sent a memorandum to Professor Broomer changing the deadline to October 22, 2007. White Dep. at 102-05, Exhibit 7; Woodworth Dep. at 155, 160. The memorandum went on to say that, "If the complete set of costumes is not available by 5:00 PM, October 22nd, I am authorizing the Director of the play, Christine Woodworth, to purchase costumes using funds currently held and/or available to the Theatre program."

21. There was a production meeting on October 22, which Professor Broomer did not attend. At 5:11on that day, Dr. Woodworth received an email from Professor Broomer detailing some of the things that were not finished. Woodworth Dep. at 161.

22. Dr. White subsequently learned that the costumes had not been completed by the deadline. White Dep. at 106-07. Dr. Johnson stopped by to see Dr. Woodworth on October 22, 2007, and she told him at that time that the Professor Broomer had not yet finished the costumes. Woodworth Dep. at 188-89.

23. Dr. Woodworth replaced Professor Broomer as costume designer for the play. White Dep. at 112; Woodworth 172.

24. On October 8, 2007, during rehearsals of *The Laramie Project*, Christine Woodworth sent an email to Albert W. Jones, describing an incident that occurred the night before with Professor Broomer. According to the email, Professor Broomer met Dr. Woodworth outside her office and asked if she had a moment to talk. The email went on to say that, when Dr. Woodworth said that she

did not, Professor Broomer said that "of course I did not have a moment to talk without 'the kids around' and that I 'had better run.'" The email also stated that as Dr. Woodworth left her office, Professor Broomer said, " 'You don't have to run away, little girl.'" Copies of the email were sent to David L. White, the Dean of the College of Arts and Sciences; Robert Johnson, who then served as Provost and Marlon O. Grass, the chair of the Performing Arts Department. Johnson Dep. Exhibit 12; Woodworth Dep. Exhibit 1.

25. This email was the only report Dr. Woodworth made of the incident. Woodworth Dep. at 212.

26. Dr. Johnson did not feel that Dr. Woodworth was in any kind of immediate danger from Professor Broomer based on the email. Johnson Dep. at 205.

27. By the spring semester of 2008, Professor Broomer had resumed her duties as costume designer. Broomer Dep. at 86-87. The University issued Professor Broomer her own credit card in 2008. Broomer Dep. at 92.

> FN1 Katie Woodring since graduation has married and is now Katie Garvey.

(Doc. 68, ¶'s 1-27).[8]

## IV. Discussion.

With respect to Plaintiff's Title VII race discrimination claim pertaining to the temporary loss of her duties as the costume designer for the University, the Court in *Page v. Trustees of Univ. of Pennsylvania*, 222 Fed. Appx. at 145, stated:

> To establish a prima facie case of Title VII [sex or race] discrimination, [Plaintiff] must show (1) that she belongs to a protected class, (2) that she suffered an adverse employment action (3) under circumstances leading to an inference of unlawful discrimination. *See Jones v. Sch. Dist. of Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999).

---

[8]All of Defendants' evidence referenced in their SMF is found at Doc. 69.  As stated, we find that all of Defendants' SMF are properly supported by their evidence.

*See also Burlington v. News Corp.*, 759 F.Supp. 2d at 592(citations omitted).

Thus, Title VII "by its terms outlaws treating employees of one race differently from another race." *Burlington*, 759 F.Supp.2d at 596.  The Court in *Burlington v. News Corp.*, 759 F.Supp. 2d at 592-593, also stated:

> Although showing that similarly situated coworkers were treated more favorably than the plaintiff is one method of satisfying the final element of a prima facie case of discrimination, it is not the only one. The Third Circuit has explained that although some circuits have required plaintiffs to make such a showing in discrimination cases, "that is not the current law in this or the majority of the circuits." *Sarullo,* 352 F.3d at 798 n. 7 (citations omitted). Indeed, the Third Circuit has counseled in *Sarullo* and elsewhere that the prima facie case is intended to be a flexible standard. *See id.* at 797–98 ("[T]he prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." (citing *Geraci v. Moody–Tottrup, Int'l, Inc.,* 82 F.3d 578, 581 (3d Cir.1996))); *see also Wishkin v. Potter,* 476 F.3d 180, 185 (3d Cir.2007) (the prima facie test must be "tailored to fit the specific context in which it is applied" (quoting *Sarullo,* 352 F.3d at 797–98) (internal quotation marks omitted)); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 798 (3d Cir.1990) ("The framework set forth in *McDonnell Douglas,* which begins with proof of a prima facie case, was 'never intended to be rigid, mechanized, or ritualistic.' " (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978))). The Third Circuit has stated that to establish a prima facie case, it is sufficient for a plaintiff to adduce evidence that "establishes a causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a juror could infer, in light of common experience, that the defendant acted with discriminatory intent." *Anderson v. Wachovia Mortg. Corp.,* 621 F.3d 261, 275 (3d Cir.2010) (discussing prima facie case in § 1981 context); *Sarullo,* 352 F.3d at 798 (plaintiff "must establish some causal nexus between his membership in a protected class" and the adverse employment decision to establish a prima facie case of discrimination in Title VII case).

Also, "the  burden to establish a prima facie case is not an onerous one." *Young v. St. James Management, LLC*, 749 F.Supp. 2d 281, 288 (E.D. Pa. 2010).  The elements are dependent on the facts of the specific case.  *Id.* (citation omitted).

Additionally, in *Bates v. MHM Correctional Services*, 2008 WL 396225, *8 (M.D. Pa.), *aff'd*
321 Fed. Appx. 217, 2009 WL 984787 (3d Cir. 2009), the Court stated:

> In order to withstand a summary judgment motion, a plaintiff suing for
> employment discrimination under Title VII must establish that the plaintiff's
> protected trait "played a role in the employer's decision making process and
> had a determinative influence on the outcome of that process." *Monaco v.
> American Gen. Assurance Co.,* 359 F.3d 296, 300 (3d Cir.2004). FN10 A
> plaintiff may meet this burden with either direct evidence sufficient to
> satisfy the requirements of Justice O'Connor's concurring opinion in *Price
> Waterhouse v. Hopkins,* 490 U.S. 288 (1989) or with indirect evidence
> sufficient to satisfy the three-step burden-shifting analysis set forth in
> *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

The *Bates* Court further stated:

> Under *McDonnell Douglas,* the plaintiff must first make a *prima facie*
> showing of discrimination. *Pivirotto v. Innovative Systems, Inc.,* 191 F.3d
> 344, 352 n. 4 (3d Cir.1999). A plaintiff can establish a prima facie case by
> showing that: (1) she is a member of a protected class; (2) was qualified
> for the position; (3) suffered an adverse employment despite her qualifications;
> and (4) under circumstances that raise an inference of discriminatory action,
> the employer continued to seek out individuals with qualifications similar
> to the plaintiff's to fill the position. *Sarullo v. United States Postal Service,*
> 352 F.3d 789, 797 (3d Cir.2003) (citations omitted). If the plaintiff cannot
> establish these elements, the defendant is entitled to judgment as a matter
> of law. *Pivirotto,* 191 F.3d at 352 n. 4.
>
> When the plaintiff establishes a *prima facie* case, the burden of production
> shifts to the defendant and requires that it produce some evidence of a
> legitimate, nondiscriminatory reason for the adverse employment action.
> *Id.*
>
> "If the plaintiff succeeds, the burden of production shifts to the
> defendant to articulate some legitimate, nondiscriminatory reason for its
> actions. The defendant's burden at this stage is relatively light: it is satisfied
> if the defendant articulates any legitimate reason for the discharge; the
> defendant need not prove that the articulated reason actually
> motivated the discharge." *Woodson v. Scott Paper Co.,* 109 F.3d 913,
> 920 n. 2 (3d Cir.1997) (internal quotation marks and citations omitted).

15

*Id.* at *8-*9.

Defendants first argue that Plaintiff has failed to show that she suffered an adverse employment action.

  1. *Whether Plaintiff suffered an adverse employment action*

Initially, as Defendants correctly point out in their reply brief (Doc. 96, p. 4), the November 9, 2009 Memorandum the Court issued regarding Defendants' Motion to Dismiss Plaintiff's SAC (Doc. 37, p. 8 and p. 16) specifically dismissed Plaintiff's Title VII claims regarding discriminatory hiring, failure to promote and denial of travel abroad since they were outside the scope of Plaintiff's EEOC charge. Therefore, any evidence or argument Plaintiff raises regarding these dismissed Title VII claims, and any evidence or argument Plaintiff raises regarding new Title VII claims which were not asserted in her EEOC charge or her SAC shall not be considered herein.

Defendants argue that Plaintiff cannot demonstrate that she suffered an adverse employment action, that the University is liable for the actions of the University Players, or that she was treated less favorably than similarly situated white employees. (*Id.*, pp. 11-12). Regarding whether Plaintiff suffered an adverse employment action, Defendants contend as follows:

> Here, plaintiff complains about her inability to serve as costume designer for five main stage productions at the University from spring semester of 2006 though the spring semester of 2008. Broomer Dep. at 83-88. She resumed her duties as costume designer for the main stage productions in the fall of 2008 with the production of *The Complete Works of William Shakespeare*. Broomer Dep. at 87-88. This temporary change in duties did not affect Broomer's position or employment status in any way. She was not demoted and lost no salary as the result of the temporary suspension of duties. Broomer Dep. at 148, 229-230. Broomer speculates that the suspension of her costume designer duties may affect her chances for future promotions, but there is no evidence that she was ever refused a promotion or was denied a pay raise because of the change of duties. Broomer Dep. at 231. [FN1].

> FN1 The likelihood of any negative inference to be drawn from the temporary suspension of plaintiff's costumes duties is further reduced by the fact that in the fall of 2006 and the spring of 2007, plaintiff taught a full load of four courses. Broomer Dep. at 179-184.

(Doc. 79, pp. 12-13).

Plaintiff argues that she suffered several adverse employment actions, including the following:

> Through Dr. Johnson and Dr. White, LHUP actually encouraged Haynes, Woolworth and Grass to file a formal written complaint (Article 43) against her, resulting in a formal investigation. (Broomer Cert. [Doc. 90] ¶¶ 54-57). Marlon Grass, the Dept. Chair, denied Prof. Broomer use of the p-card while Caucasian faculty had free access to same, depriving her of a tool necessary to effectively do her job. (Broomer Cert. ¶ 14-24). This is clearly adverse employment action.

> Dr. White publicly removed Prof. Broomer from her costume responsibilities and then Dr. Harvey accused her of violating the CBA by not designing costumes, all in written reprimands. (Broomer Cert. ¶ 36-37). Dr. Harvey gave Prof. Broomer a negative evaluation while recommending the Caucasian candidates without reservation. (Broomer Cert. ¶ 123; Hamilton Cert. ¶ 6-8).

> With one day's notice, Dr. White moved the *Laramie Project* costume deadline from October 31, 2007 to October 22, 2007, guaranteeing that Prof. Broomer would fail. (Broomer Cert. ¶¶ 75-94). Removal from design responsibilities for *Little Shop of Horrors* in 2006 and *Laramie Project* in 2007 caused public humiliation, deprived Prof. Broomer of show and portfolio credit for her costuming, and made it impossible to teach the related costuming courses that semester. (Broomer Cert. ¶ 75-94).

(Doc. 89, pp. 10-11).

As mentioned, we concur with Defendants (Doc. 79, p. 11 and Doc. 96, p. 5) that Plaintiff's remaining Title VII race discrimination claim pertains only to the temporary loss of her duties as the costume designer for the University. As indicated above, the Court, in its November 9, 2009 Memorandum issued in this case with respect to Defendants' Motion to Dismiss Plaintiff's SAC,

stated "[Plaintiff's] March 7, 2007 EEOC charge specifically identifies false allegations against Plaintiff and removal from her position as costume designer as the particular discriminatory conduct to which she was subjected." (Doc. 37, p. 8). The above stated evidence and arguments Plaintiff raises in her opposition brief regarding new Title VII claims are beyond the scope of this case and were not asserted in her EEOC charge or her SAC, as such they simply cannot be considered with respect to Defendants' Summary Judgment Motion. *See Young v. St. James Management, LLC*, 749 F.Supp. 2d at 294("[Plaintiff 's] Title VII claims are confined to the scope of the complaints he asserted in his EEOC charge.").

In *Young v. St. James Management, LLC*, 749 F.Supp. 2d at 296-297, the Court found that its Plaintiff did not establish a *prima facie* case of discrimination under Title VII since the events he described did not rise to the level of an actionable employment action. The Court in *Young v. St. James Management, LLC*, 749 F.Supp. 2d at 296-297, stated:

> An adverse employment action is one "that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.' " *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir.2004) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir.2001)). "Not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996). Although "formal reprimands that result in a notation in an employee's personnel file" can support a finding of adverse employment action, *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1298 (3d Cir.1997), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), this is true only if they significantly change an employee's employment status. *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224 (10th Cir.2006).

During her May 28, 2010 deposition, Plaintiff Broomer testified that when she was first hired by the University in 2001 she began designing and constructing costumes immediately, and these duties were part of her position title. (Doc. 69-2, pp. 82-83). Plaintiff also admitted that at the time

of her deposition in this case (*i.e.* May 28, 2010) she was currently designing costumes and serving

as the costume designer for the University.  (*Id*.).  Further, Plaintiff testified as follows:

> Q.    How long  - - - can you identify the years or the semesters that you did not serve as the costume designer within the department of performing arts?
>
> A.    [Plaintiff Broomer]  It was four semesters.
>
> Q.    Okay.  Can you tell me which semesters those were?
>
> A.    Spring and fall of 2007, and spring and fall of 2008.
>
> Q.    So would it be  - - -   okay.  And then as of  - - - in the spring of 2009, you were   - - - you assumed your duties as costume designer?
>
> A.    Yes.
>
> Q.    And except for those times when you were not doing the costumes, did you do costumes for both the main stage and the studio productions?
>
> A.    The studio shows are student-run, so the students will do the designing in the studio.  They do the casting and they'll direct. And unless the University Players approves, then a faculty member can direct.  But normally, those are all totally student-run productions in a studio theater.
>
> Q.    So your responsibility as costume designer is for the main stage productions?
>
> A.    Yes.
>
> Q.    Can you tell us which  - - I've found this most helpful, because I get all the years blend into one, is to talk about the productions. Which productions did you end up not doing the costumes for?
>
> A.    It was Little Shop of Horrors  - - -.
>
> Q.    And that was in the  - - -

19

A.     Spring.

Q.     - - - spring of '08?   '07, I'm sorry.   '07.

A.     Yeah.

Q.     Okay.

A.     And then Machina.   And it's spelled capital M-A-C-H-I-N-A-L. And just to clarify; initially I started on Little Shop, but was taken off.

Q.     Okay.

A.     Then Machina.   And then the spring of the following year, it was Tartuffe, T-A-R-T-U-F-F-E.   And then in the fall was Laramie Project.   That's 2006-2007.   Is that what I said; 2006-2007?

Q.     No  - - -.

A.     Was that the two I gave?

Q.     Let's go back.   Little Shop was in the spring of '07; is that right?

A.     I'm sorry.   That's spring of '06.

A.     Okay.

Q.     This is '06.   And then in the fall of '06 was Machina.

Q.     Okay.

A.     Spring of '07 was Tartuffe.   And fall of '07 was Laramie Project.

Q.     Okay.   So Laramie Project was fall of '07?

A.     Yes.   So spring of 2008 was when I was back to working again.

Q.     And what production was that?

A.     On the Complete Works of William Shakespeare.   That was the name of the play; the Complete Works of William Shakespeare.

20

ATTORNEY HAMILTON:

Was that spring or fall?

A.      Let me think  - - -

ATTORNEY HAMILTON:

And since we're doing this just for a timeline, I'm wondering where Seussical fell.

A.      You know what - - -?

BY ATTORNEY HARVEY:

Q.      So you've asked a good question.

A.      That's right.

Q.      I don't mind you asking those kind of questions.

A.      Seussical was spring of 2008, not Complete Works of William Shakespeare.  I didn't do Complete Works of William Shakespeare until fall of 2008. **That's when I was reinstated as costume designer; fall 2008.**  So it's Little Shop; Machina, 2006; then Tartuffe, Laramie Project, 2007.  Then spring of 2008 was Seussical.  Fall of 2008 was Complete Works of William Shakespeare.

(*Id.*, pp. 84-87) (Emphasis added).

Thus, there were only three semesters, spring and fall of 2007 and spring of 2008, for which Plaintiff did not serve as the University's costume designer with the department of the performing arts.  There were five main stage productions for which Plaintiff did not serve as the costume designer.  Plaintiff was reinstated as costume designer in the fall of 2008 when she did the costumes for the Complete Works of William Shakespeare.  Plaintiff also testified that since the fall of 2008 to the present time, she has been consistently (uninterrupted) doing the costumes for the

University's main stage projects.  (*Id.* at 88).

       During the short temporary time period in which Plaintiff was not serving as the costume

designer due to the dispute in which the University Players were not willing to advance Plaintiff

money for costumes, Plaintiff admitted that she was not demoted, that she was not docked any pay

and, that she did not receive any less salary.  Specifically, Plaintiff testified as follows:

> Q.     Okay.  Now, we've heard  - - - and I might have the term incorrect.
>        I just want to make sure.  That you received course credit for your
>        role as costume designer; is that the right word?
>
> A.     [Plaintiff Broomer]  It's release time.
>
> Q.     Release time.
>
> A.     Yeah, release time.
>
> Q.     And how does that work?
>
> A.     So must of the faculty at Lock Haven University have a four-course
>        load.  In the theater department, if you direct or design a course,
>        you teach three classes and the fourth part of your load is release
>        time to direct or design.
>
> Q.     And does that  - - - whether or not you have release time or teach
>        four classes, does that affect your pay at all?
>
> A.     No, it does not affect your pay.
>
> Q.     Now, when you were removed from Little Shop of Horrors, at that
>        point is it fair to say you were teaching three classes, but you were
>        no longer doing design work?
>
> A.     Yes, yeah.
>
> Q.     So did that result in docking your pay somehow?
>
> A.     No.  And at no time did I stop doing my job.  I tried to continue to
>        do my job to the best of my ability.  And a part of my training and

> experience, I know how to redesign or make items from fabric.  So
> the items that I was creating, they weren't second-rate or second-
> class items.  They were - - - and Stephen attests to that in that e-
> mail.  And I could have continued to make things to a point, but I
> would've needed funding to continue.

(*Id.*, pp. 147-148).

Additionally, Plaintiff stated that she did not lose any release time when she was temporarily removed from her duty as costume designer only for three semesters, and that she did not lose any salary during this limited time. (*Id.*, pp. 229-230).

Further, as of March 2006, the University Players were no longer issuing checks to Plaintiff for costumes due to the open voucher matter and the outstanding balance Plaintiff owed to the University Players.  Plaintiff was offered four options so that she could continue designing costumes and receive the necessary funding, but she did not opt for any of the options.  (*Id.*, pp. 137-141). As Defendants point out, one action taken by the University's administration with respect to Plaintiff's costume duties occurred in October 2007 when Defendant White authorized the Director of The Laramie Project play, Defendant Woodworth, to buy costumes if the complete set was not available by COB October 22, 2007.  (Doc. 69-3, p. 35).  Also, a second action was in the spring of 2008 when Plaintiff was reassigned from the theater to dance production.  (Doc. 69-3, p. 60).  As stated, there is no dispute that in the fall semester of 2008, Plaintiff was again performing her duties as costume designer for the main stage productions.

We agree with Defendants and find based on the undisputed evidence that Plaintiff has failed to establish a *prima facie* case of race discrimination under Title VII since the evidence does not show Defendants took sufficient adverse employment actions against Plaintiff during the three

semesters in which Plaintiff was temporarily removed from her costume design duties.  *See Young v. St. James Management, LLC*, 749 F.Supp. 2d at 296-297.  Also, as indicated, reprimands that do not affect Plaintiff 's employment status do not constitute adverse employment actions.  *Id*. at 297.  In any event, we agree with Defendants (Doc. 96, p. 6) that there is no evidence that Plaintiff received any written reprimands.  In her SMF at ¶ 36 (Doc. 90), Plaintiff only avers that on October 23, 2006, she received a letter from Dr. Harvey asking her to come to a decision about her costuming duties even though she did not ever refuse to design a costume or do the work she was hired to do.  (*See* Doc. 90, Ex. G).  Further, the evidence shows that the minor actions described above taken by the University's administration and the short suspension of Plaintiff's costuming duties were not significant and did not alter the terms of Plaintiff's employment and her costume designer duties.  *See Storey v. Burns Intern. Security Services*, 390 F.3d 760, 764 (3d Cir. 2004).

Thus, we agree with Defendants (Doc. 79, p. 14 and Doc. 96, pp. 8-9) that they are entitled to summary judgment with respect to Plaintiff's remaining Title VII claim since Plaintiff has failed to establish that she suffered an adverse employment action.  *See Young v. St. James Management, LLC*, 749 F.Supp. 2d at 297.

Based on the above, we shall recommend that Defendants' Summary Judgment Motion (Doc. 67) be granted with respect to Plaintiff's federal claim, Title VII race discrimination claim against Defendants the University and the PA State System of Higher Education for the temporary loss of her costume design duties.  Since we shall recommend that Plaintiff's federal claim over which this Court has original jurisdiction (*i.e.* Title VII claim) not be permitted to proceed to trial, we will also recommend that the Court decline to exercise supplemental jurisdiction over Plaintiff's

state law defamation claim against Defendant Woodworth. *See* 28 U.S.C. § 1367(c)(3); *Verdecchia v. Prozan,* 274 F.Supp.2d 712, 728 (W.D. Pa. 2003).

**V. Recommendation.**

Based on the above, it is respectfully recommended that the Defendants' Motion for Summary Judgment **(Doc. 67)** be granted with respect to Plaintiff's remaining federal claim, Title VII race discrimination claim against Defendants, the University and the Pennsylvania State System of Higher Education. Since we recommend that Plaintiff's federal claim over which this Court has original jurisdiction (*i.e.* Title VII claim) not be permitted to proceed to trial, we also recommend that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law defamation claim against Defendant Woodworth. *See* 28 U.S.C. § 1367(c)(3); *Verdecchia v. Prozan,* 274 F.Supp.2d 712, 728 (W.D. Pa. 2003).

s/ Thomas M. Blewitt
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: February 7, 2012**

25

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RAMONA BROOMER,                    :        CIVIL ACTION NO. **4:CV-09-0027**
                                   :
          Plaintiff                :
                                   :        (Judge Jones)
          v.                       :
                                   :        (Magistrate Judge Blewitt)
LOCH HAVEN UNIVERSITY, et al.,     :
                                   :
          Defendants               :

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **February 7, 2012.**

Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter described in
> 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
> disposition of a prisoner case or a habeas corpus petition within fourteen (14)
> days after being served with a copy thereof.  Such party shall file
> with the clerk of court, and serve on the magistrate judge and all
> parties, written objections which shall specifically identify the
> portions of the proposed findings, recommendations or report to which
> objection is made and the basis for such objections.  The briefing
> requirements set forth in Local Rule 72.2 shall apply.  A judge shall
> make a *de novo* determination of those portions of the report or
> specified proposed findings or recommendations to which objection
> is made and may accept, reject, or modify, in whole or in part, the findings
> or recommendations made by the magistrate judge.  The judge, however,
> need conduct a new hearing only in his or her discretion or where
> required by law, and may consider the record developed before the
> magistrate judge, making his or her own determination on the basis

26

of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.


                                            **s/ Thomas M. Blewitt**

_____  **THOMAS M. BLEWITT**
                                            **United States Magistrate Judge**

**Dated: February 7, 2012**